905 F.2d 1558
 284 U.S.App.D.C. 391
 James BIAS, as Personal Representative of the Estate of
Leonard Kevin Bias, Deceased, Appellant,
v.
ADVANTAGE INTERNATIONAL, INC. and A. Lee Fentress, Appellees.
ADVANTAGE INTERNATIONAL, INC., Cross-Appellant,
v.
James BIAS, as Personal Representative of the Estate of
Leonard Kevin Bias, Deceased, Cross-Appellee.
 Nos. 89-7116, 89-7117.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 19, 1990.
Decided June 15, 1990.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 87-01951).
 James R. Eyler, with whom Mauricio E. Barreiro, Baltimore, Md., was on the brief, for appellant in No. 89-7116 and cross-appellee in No. 89-7117.
 Patrick W. Lee, with whom John A. Macleod and Luther Zeigler, Washington, D.C., were on the brief, for appellees in No. 89-7116 and cross-appellant in No. 89-7117.
 Before SILBERMAN, WILLIAMS, and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 SENTELLE, Circuit Judge:
 
 
 1
 This case arises out of the tragic death from cocaine intoxication of University of Maryland basketball star Leonard K. Bias ("Bias"). James Bias, as Personal Representative of the Estate of Leonard K. Bias, deceased ("the Estate"), appeals an order of the District Court for the District of Columbia which granted summary judgment to defendants Advantage International, Inc. ("Advantage") and A. Lee Fentress on the Estate's claims arising out of a representation agreement between Bias and Advantage. Advantage and Fentress (collectively "the defendants") cross-appeal the District Court's grant of summary judgment to the Estate on the defendants' counterclaims, but the defendants represent that they will not press their appeal of the District Court's order with respect to the counterclaims if this Court affirms the District Court's summary judgment to the defendants with respect to the Estate's claims. For the reasons which follow, we affirm the order of the District Court granting to the defendants summary judgment with respect to the Estate's claims and we do not address the District Court's order with respect to the defendants' counterclaims.
 
 I. BACKGROUND
 
 2
 On April 7, 1986, after the close of his college basketball career, Bias entered into a representation agreement with Advantage whereby Advantage agreed to advise and represent Bias in his affairs. Fentress was the particular Advantage representative servicing the Bias account. On June 17 of that year Bias was picked by the Boston Celtics in the first round of the National Basketball Association draft. On the morning of June 19, 1986, Bias died of cocaine intoxication. The Estate sued Advantage and Fentress for two separate injuries allegedly arising out of the representation arrangement between Bias and the defendants.[1]
 
 
 3
 First, the Estate alleges that, prior to Bias's death, Bias and his parents directed Fentress to obtain a one-million dollar life insurance policy on Bias's life, that Fentress represented to Bias and Bias's parents that he had secured such a policy, and that in reliance on Fentress's assurances, Bias's parents did not independently seek to buy an insurance policy on Bias's life. Although the defendants did obtain increased disability coverage for Bias, in a one-million dollar disability insurance policy with an accidental death rider, they did not secure any life insurance coverage for Bias prior to his death.
 
 
 4
 Second, on June 18, 1986, the day after he was drafted by the Boston Celtics, Bias, through and with Fentress, entered into negotiations with Reebok International, Ltd. ("Reebok") concerning a potential endorsement contract. The Estate alleges that after several hours of negotiations Fentress requested that Bias and his father leave so that Fentress could continue negotiating with Reebok representatives in private. The Estate alleges that Fentress then began negotiating a proposed package deal with Reebok on behalf of not just Bias, but also other players represented by Advantage. The Estate contends that Fentress breached a duty to Bias by negotiating on behalf of other players, and that because Fentress opened up these broader negotiations he was unable to complete the negotiations for Bias on June 18. The Estate claims that as a result of Fentress's actions, on June 19, when Bias died, Bias had no contract with Reebok. The Estate alleges that the contract that Bias would have obtained would have provided for an unconditional lump sum payment which Bias would have received up front.
 
 
 5
 The District Court awarded the defendants summary judgment on both of these claims.[2] With respect to the first claim, the District Court held, in effect, that the Estate did not suffer any damage from the defendants' alleged failure to obtain life insurance for Bias because, even if the defendants had tried to obtain a one-million dollar policy on Bias's life, they would not have been able to do so. The District Court based this conclusion on the facts, about which it found no genuine issue, that Bias was a cocaine user and that no insurer in 1986 would have issued a one-million dollar life insurance policy, or "jumbo" policy, to a cocaine user unless the applicant made a misrepresentation regarding the applicant's use of drugs, thereby rendering the insurance policy void.
 
 
 6
 With respect to the Estate's second claim, the District Court concluded that the defendants could not be held liable for failing to produce a finished endorsement contract with Reebok before Bias's death because the defendants had no independent reason to expedite the signing of the endorsement contract to the extent argued by the Estate, and because the defendants could not have obtained a signed contract before Bias's death even if they had tried to do so.
 
 
 7
 The Estate appeals both of the District Court's conclusions, arguing that there is a genuine issue as to Bias's insurability and regarding the defendants' failure to sign a Reebok contract on Bias's behalf prior to Bias's death.
 
 II. SUMMARY JUDGMENT STANDARD
 
 8
 Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment where
 
 
 9
 the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
 
 
 10
 The Supreme Court has stated that the moving party always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The Supreme Court also explained that summary judgment is appropriate, no matter which party is the moving party, where a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322, 106 S.Ct. at 2552. Thus, the moving party must explain its reasons for concluding that the record does not reveal any genuine issues of material fact, and must make a showing supporting its claims insofar as those claims involve issues on which it will bear the burden at trial.
 
 
 11
 Once the moving party has carried its burden, the responsibility then shifts to the nonmoving party to show that there is, in fact, a genuine issue of material fact. The Supreme Court has directed that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). The nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.' " Id. at 587, 106 S.Ct. at 1356 (citations omitted) (emphasis in original). In evaluating the nonmovant's proffer, a court must of course draw from the evidence all justifiable inferences in favor of the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986).
 
 III. THE INSURANCE ISSUE
 
 12
 The District Court's determination that there was no genuine issue involving Bias's insurability rests on two subsidiary conclusions: First, the District Court concluded that there was no genuine issue as to the fact that Bias was a drug user. Second, the District Court held that there was no dispute about the fact that as a drug user, Bias could not have obtained a jumbo life insurance policy. We can only affirm the District Court's award of summary judgment to the defendants on the insurance issue if both of these conclusions were correct.
 
 A. Bias's Prior Drug Use
 
 13
 The defendants in this case offered the eyewitness testimony of two former teammates of Bias, Terry Long and David Gregg, in order to show that Bias was a cocaine user during the period prior to his death. Long and Gregg both described numerous occasions when they saw Bias ingest cocaine, and Long testified that he was introduced to cocaine by Bias and that Bias sometimes supplied others with cocaine.
 
 
 14
 Although on appeal the Estate attempts to discredit the testimony of Long and Gregg, the Estate did not seek to impeach the testimony of these witnesses before the District Court, and the Estate made no effort to depose these witnesses. Instead, the Estate offered affidavits from each of Bias's parents stating that Bias was not a drug user; the deposition testimony of Bias's basketball coach, Charles "Lefty" Driesell, who testified that he knew Bias well for four years and never knew Bias to be a user of drugs at any time prior to his death; and the results of several drug tests administered to Bias during the four years prior to his death which may have shown that, on the occasions when the tests were administered, there were no traces in Bias's system of the drugs for which he was tested.
 
 
 15
 Because the Estate's generalized evidence that Bias was not a drug user did not contradict the more specific testimony of teammates who knew Bias well and had seen him use cocaine on particular occasions, the District Court determined that there was no genuine issue as to the fact that Bias was a drug user. We agree.
 
 
 16
 There is no question that the defendants satisfied their initial burden on the issue of Bias's drug use. The testimony of Long and Gregg clearly tends to show that Bias was a cocaine user. We also agree with the District Court that the Estate did not rebut the defendants' showing. The testimony of Bias's parents to the effect that they knew Bias well and did not know him to be a drug user does not rebut the Long and Gregg testimony about Bias's drug use on particular occasions. The District Court properly held that rebuttal testimony either must come from persons familiar with the particular events to which the defendants' witnesses testified or must otherwise cast more than metaphysical doubt on the credibility of that testimony. Bias's parents and coach did not have personal knowledge of Bias's activities at the sorts of parties and gatherings about which Long and Gregg testified. The drug test results offered by the Estate may show that Bias had no cocaine in his system on the dates when the tests were administered, but, as the District Court correctly noted, these tests speak only to Bias's abstention during the periods preceding the tests. The tests do not rebut the Long and Gregg testimony that on a number of occasions Bias ingested cocaine in their presence.
 
 
 17
 The Estate could have deposed Long and Gregg, or otherwise attempted to impeach their testimony. The Estate also could have offered the testimony of other friends or teammates of Bias who were present at some of the gatherings described by Long and Gregg, who went out with Bias frequently, or who were otherwise familiar with his social habits. The Estate did none of these things. The Estate is not entitled to reach the jury merely on the supposition that the jury might not believe the defendants' witnesses. We thus agree with the District Court that there was no genuine issue of fact concerning Bias's status as a cocaine user.
 
 
 18
 B. The Availability of a Jumbo Policy in Light of Bias's Prior Drug Use
 
 
 19
 The defendants submitted affidavits from several experts who testified that in their expert opinions no insurer in 1986 would have issued a jumbo policy without inquiring, at some point in the application process, about the applicant's prior drug use. Dr. Francis Achampong, an Associate Professor of Business Law and Insurance and an occasional consultant for the insurance industry, asserted that life insurance companies will always and as a routine matter ask an applicant whether the applicant has ever used cocaine before issuing a term life policy of this size to that applicant. Joint Appendix ("J.A.") 61. Dr. Achampong testified that insurers inquire about prior drug use at some stage of the application process, generally either in the initial application, during the medical examination, during the follow-up character investigation, or at some other stage. J.A. 466. Dr. Achampong further concluded that an affirmative answer to this question renders an applicant uninsurable because, "[a]s a matter of standard underwriting procedure, insurance companies do not issue term life insurance policies, let alone $1 million term policies, to applicants they know have recently used cocaine." J.A. 61. Bernard R. Wolfe, a licensed insurance agent experienced in evaluating the insurance needs of professional athletes, offered essentially the same opinion that insurance companies do not issue substantial term life insurance policies without first investigating an applicant's prior drug use and that insurance companies do not issue substantial term life insurance policies to applicants who use cocaine. J.A. 79.
 
 
 20
 The Estate responded with expert testimony of its own showing that in 1986 some companies did not inquire about an applicant's prior drug use at the application stage and that other companies at that time did not inquire about an applicant's prior drug use at the medical examination stage of the application process. The Estate did not offer any testimony showing that a company existed at that time which would not have inquired about an applicant's prior drug use at some stage in the process. Moreover, the Estate did not offer any testimony tending to show that even if an applicant did admit to being a cocaine user, a company existed in 1986 which would have issued a jumbo policy to that applicant. The District Court thus concluded that the Estate had failed to rebut the defendants' showing that as a cocaine user Bias would have been unable to obtain a jumbo policy. The District Court recognized that Bias might have been able to obtain a policy by lying about his prior drug use, but rightly concluded that such a knowing and material misrepresentation in response to a direct question would have rendered void any policy which Bias thereby obtained. See D.C.Code Ann. Sec. 35-414 (1988).
 
 
 21
 We agree with the District Court. The defendants offered evidence that every insurance company inquires about the prior drug use of an applicant for a jumbo policy at some point in the application process. The Estate's evidence that some insurance companies existed in 1986 which did not inquire about prior drug use at certain particular stages in the application process does not undermine the defendant's claim that at some point in the process every insurance company did inquire about drug use, particularly where a jumbo policy was involved. The Estate failed to name a single particular company or provide other evidence that a single company existed which would have issued a jumbo policy in 1986 without inquiring about the applicant's drug use. Because the Estate has failed to do more than show that there is "some metaphysical doubt as to the material facts," Matsushita Elec., 475 U.S. at 586, 106 S.Ct. at 1356, the District Court properly concluded that there was no genuine issue of material fact as to the insurability of a drug user.
 
 IV. THE REEBOK CONTRACT
 
 22
 We find no merit in the Estate's claim based on the Reebok contract negotiations. Neither the language of the representation agreement between Bias and Advantage nor any other evidence could support a finding that the defendants breached any duty to Bias by failing to push to obtain a signed contract on June 18, 1986.
 
 
 23
 Even if the defendants were under some duty to try to sign a contract for Bias as quickly as possible, the Estate has offered no evidence to rebut the defendants' showing that the contract could not possibly have been signed prior to Bias's death, irrespective of the defendants' actions. The defendants offered testimony from Reebok officials that the language of any agreement between Reebok and Bias would have had to be reviewed by the Reebok legal department before Reebok would have signed the agreement. J.A. 144. The Estate did not counter the defendants' evidence that an endorsement contract cannot be negotiated, drafted, and signed in a single day. In fact, the Estate's own expert testified that a contract between Bias and Reebok could not feasibly have been signed on June 18, 1986. J.A. 125. The Estate must do more than merely argue that the feasibility of obtaining a signed endorsement contract in a single day is a question for the jury; it must offer some basis for its claim that a jury could reasonably conclude that the contract could have been drafted and signed on June 18. Because the Estate failed to do this, we affirm the District Court's award of summary judgment to the defendants on this claim.
 
 V. CONCLUSION
 
 24
 In order to withstand a summary judgment motion once the moving party has made a prima facie showing to support its claims, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The Estate has failed to come forward with such facts in this case, relying instead on bare arguments and allegations or on evidence which does not actually create a genuine issue for trial. For this reason, we affirm the District Court's award of summary judgment to the defendants in this case.[3]
 
 
 
 [1]
 The Estate also sued Fidelity Security Life Insurance Company and Reebok International, Ltd. The District Court awarded summary judgment to Fidelity and Reebok and the Estate does not appeal the District Court's orders with respect to those two defendants
 
 
 [2]
 The District Court also concluded that, in any event, Fentress could not be held individually liable because all of his activities on behalf of Bias were performed in his official capacity as an officer or agent of Advantage. We need not address this aspect of the District Court's order because we affirm the District Court's award of summary judgment to both defendants for the reasons discussed in this opinion
 
 
 [3]
 The defendants represent that they will not press their appeal of the District Court's award of summary judgment to the Estate on the defendants' counterclaims if this Court affirms the District Court's summary judgment to the defendants on the Estate's claims. Because we do affirm the District Court's order with respect to the Estate's claims, we need not address the District Court's order with respect to the defendants' counterclaims